UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

ZOILA VILLAREAL,                                    No. C 12-02334 LB

                Plaintiff,              **ORDER (1) GRANTING IN PART**
      v.                                      **PLAINTIFF'S MOTION FOR**
                                          **SUMMARY JUDGMENT,**
MICHAEL J. ASTRUE, commissioner of      **(2) DENYING DEFENDANT'S**
Social Security.                                    **CROSS-MOTION FOR SUMMARY**
                                      **JUDGMENT, AND (3) REMANDING**
                Defendant.              **FOR FURTHER CONSIDERATION**

                            [Re ECF Nos. 20, 21]
_____/

### INTRODUCTION

    Plaintiff Zoila Villareal moves for summary judgment, seeking judicial review of a final decision

by defendant Michael Astrue, the Commissioner of Social Security Administration (the

"Commissioner")[1], denying her Supplemental Security Income ("SSI") disability benefits for her

---

    [1]  Mr. Astrue is no longer the Commissioner and neither party has asked the court to
substitute Carolyn W. Colvin, the current Acting Commissioner of Social Security in Mr. Astrue's
place.  Nonetheless, the Social Security Act permits this action to continue.  *See* 42 U.S.C. § 405(g).

major depressive disorder and other mental problems.[2]  Pl.'s Mot., ECF No. 20;[3] Administrative

Record ("AR") 32, 123.  The Administrative Law Judge ("ALJ") determined that Ms. Villareal was

not disabled, and that while she could not perform her past relevant work, she could perform

unskilled jobs that exist in significant numbers in the national economy.  AR 31-32.

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 12-13.  For

the reasons stated below, the court **GRANTS IN PART** Ms. Villareal's motion for summary

judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** this

case to the ALJ to conduct a proper inquiry into the opinion of Dr. Chai and the author of the

unsigned Third Party Function report.

**STATEMENT**

**I. PROCEDURAL HISTORY**

On August 11, 2008, Ms. Villareal, now 61 years old, filed an application for supplemental

security income under Title XVI of the Social Security Act.  AR 59.  The Commissioner denied her

application both initially and upon reconsideration.  AR 61-65, 70-74.  On July 10, 2009, Ms.

Villareal timely requested a hearing before an ALJ.  AR 76.  Ms. Villareal's hearing was held on

May 20, 2010 before ALJ Nancy Lisewski.  AR 42-58.  Ms. Villareal appeared with her attorney,

Angelina Valle, and testified along with vocational expert Thomas Linvill (the "VE").  AR 42.

The ALJ issued her decision on August 5, 2010, and found that Ms. Villareal was not disabled.

AR 31-32.  The ALJ found that Ms. Villareal was unable to perform her past relevant work, but she

was capable of performing simple, repetitive jobs that exist in significant numbers in the national

economy.  AR 31-32.

Ms. Villareal requested that the Appeals Council review the ALJ's decision.  AR 18.  On March

21, 2012, the Appeals Council denied Ms. Villareal's request for review, rendering the ALJ's

---

[2]  The ALJ also denied Ms. Villareal benefits based on her alleged physical impairments.
*See* AR 28.  Ms. Villareal's moving papers do not challenge or otherwise mention that decision.

[3]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
generated page numbers at the top of the document.

1    August 5, 2010, decision the Commissioner's final decision.  AR 1-3.

2        On May 9, 2012, Ms. Villareal filed a complaint in this court, seeking judicial review of the

3    Commissioner's decision under 42 U.S.C. § 1383(c).  Compl., ECF No. 1.  Both parties now move

4    for summary judgment.  Pl.'s Mot., ECF No. 20; Comm'r's Opp'n and Cross-Mot., ECF No. 21.

5    **II.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

6        This section summarizes (A) the medical evidence in the administrative record, (B) other opinion

7    evidence in the administrative record, (C) the vocational expert's testimony, (D) Ms. Villareal's

8    testimony, and (E) the ALJ's findings.

9        **A.  Medical Evidence**

10           ***1.  Dr. Juan Posada in 2008***

11        Dr. Juan Posada, M.D., a family practitioner in San Jose, California, treated Ms. Villareal three

12   times in March through July of 2008.  AR 251-53.  First, on March 31, 2008, he prescribed Zyrtec

13   for her allergic rhinitis, and noted that she had asthma-induced problems and chronic headaches, for

14   which he referred her to a neurologist.  AR 251.  On July 2, 2008, Dr. Posada's notes indicate that

15   Ms. Villareal complained of a urinary tract infection, shortness of breath, and severe lower back

16   pain.  AR 253.  He prescribed Bactrium for the urinary tract infection and noted that she had a

17   chronic cough.  AR 253.  On July 15, 2008, Dr. Posada prescribed Cipro for Ms. Villareal's urinary

18   tract infection, which had recurred.  AR 252.

19       Dr. Posada sent Ms. Villareal to Dr. Julie Miller, M.D., a radiologist at Just X-Rays, for an exam,

20   which was performed on July 30, 3008.  AR 254.  She noted that Ms. Villareal had a "[n]ormal PA

21   and lateral chest examination."  AR 254.

22           ***2.  Dr. Hossein Habibi on 8/6/08***

23       Dr. Posada also referred Ms. Villareal to urologist Dr. Hossein Habibi, who examined Ms.

24   Villaral on August 6, 2008.  AR 255, 266.  Dr. Habibi noted that Ms. Villareal complained of

25   recurrent urinary tract infections that had been treated with antibiotics and also that she had passed

26   two kidney stones.  AR 266.  He further noted she had kidney and bladder pain after passing the

27   stones.  AR 267.  He ordered a Urinalysis on Ms. Villareal, which was performed by Dr. Caroline

28   Yap, M.D., at Quest Diagnostics on August 7, 2008.  AR 265.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Dr. Habibi also referred Ms. Villareal to Dr. Elizabeth Schneider, M.D., a radiologist with Valley

2    Radiology Medical Associates, Inc, for a renal ultrasound. AR 268-69. The ultrasound, performed

3    on August 22, 2008, indicated that Ms. Villarel had a "[s]mall left renal cyst," "[n]o evidence of

4    renal calculus or hydronephrosis, and "[s]mall to moderate post-void residual." AR 268.

5        **3. Dr. W. Jackson on October 1, 2008**

6    On October 1, 2008, Dr. W. Jackson, M.D., a non-treating State agency consultant, completed an

7    initial Medical Evaluation / Case Analysis on Ms. Villareal. AR 270-71. Dr. Jackson concluded

8    that there was no evidence to support her allegation of headaches. AR 271. He also concluded that

9    her kidney problems seemed to have resulted from a kidney stone that had passed and that her

10   physical symptoms were non-severe. AR 271. While Dr. Jackson found that Ms. Villareal had

11   depressive symptoms, he opined that they were not disabling. AR 271.

12       **4. Dr. Baoling Chai in September and October 2008**

13   Beginning on September 24, 2008, Ms. Villareal was treated by Dr. Baoling Chai, a psychiatrist

14   with Momentum for Mental Health in Santa Clara County. *See* AR 301-12. On September 24, Dr.

15   Chai gave Ms. Villareal prescriptions for Zoloft and Risperidone. *See* AR 301.

16   Dr. Chai took extensive notes of Ms. Villareal's visit on October 16, 2008, though many of these

17   are illegible. *See* AR 310-12. The doctor recorded that Ms. Villareal was feeling a "little better"

18   and her mood was "okay." AR 312. Her sleep and appetite were fair. *Id.* She was positive for

19   irritability and anxiety but negative for violent behavior. *Id.* Dr. Chai wrote that "she is able to take

20   care of herself and children." *Id.* During the visit, Dr. Chai noted that Ms. Villareal made "fair to

21   poor" eye contact, and her attention span also was fair to poor. *Id.* Dr. Chai also recorded that Ms.

22   Villareal had agreed to psychotherapy. *Id.*

23       **5. Dr. Antoinette Acenas on October 11, 2008**

24   On October 11, 2008, Dr. Antoinette Acenas, a psychiatrist with MDSI Physician Services,

25   conducted a comprehensive psychiatric evaluation on Ms. Villareal for the purpose of a disability

26   determination. AR 274. She did not review any of Ms. Villareal's medical records. *Id.*

27   According to Dr. Acenas, Ms. Villareal presented with anxiety and depression. Ms. Villareal

28   complained "of poor self-esteem, social withdrawl, crying all the time, and poor motivation." *Id.*

According to Dr. Acenas, Ms. Villareal stated that she finally decided to seek psychiatric treatment one week previously, had been seen by Dr. Chai, and was tolerating the Sertraline and Risperdal that Dr. Chai had prescribed.[4]  *Id.*  Dr. Acenas found that Ms. Villareal's mood was "depressed with an appropriate effect" but that she was coherent and "friendly and cooperative."  AR 275.  Ms. Villareal had come alone to the examination by use of public transportation.  AR 274.  Dr. Acenas reported that Ms. Villareal stated she was capable of maintaining her personal grooming and hygiene, performing household chores, and socializing with some friends and family.  AR 275.  Dr. Acenas wrote that Ms. Villareal was able to recall two-thirds of objects within three minutes, knew that Arnold Schwarzenegger was governor of California, could do calculations with "serial 3s," could spell the word "world" forward and backward, and identified that apples and oranges are both fruit but differ in other respects.  AR 275-76.  In interpreting the phrase "Don't cry over spilled milk," Ms. Villareal stated, "There are people who are worse off, so don't cry."  AR 276.  When asked what she would do if a fire broke out, Ms. Villareal stated, "Fall to the ground."  *Id.*

With regard to Ms. Villareal's abilities, Dr. Acenas concluded that Ms. Villareal's GAF score was 70 and provided the following functional assessment:

> Although the claimant does have depression, it is now recently being treated and given enough time her depression will improve and she will be able to perform work on a consistent basis, maintain regular attendance in the workplace, and complete a normal workweek.
>
> The claimant will likewise also be able to deal with the usual stress encountered in a competitive workplace.

AR 276-77.

### 6. Dr. Chai in November 2008

Ms. Villareal had more appointments with Dr. Chai in November 2008.[5]  *See* AR 305-09.  On November 4, 2008, Dr. Chai noted that Ms. Villareal reported feeling "better" with fair sleep and appetite and an "okay mood."  AR 309.  Ms. Villareal was positive for anxiety and agitation (though

---

[4]  Setraline is a generic version of Zoloft.  Risperdal is the trade name of Risperidone.

[5]  Ms. Villareal missed or cancelled appointments appointments in December 2008.
*See* AR 308 (missed 12/2/08 appointment); AR 306 (cancelled 12/10/08 appointment).

UNITED STATES DISTRICT COURT
For the Northern District of California

her agitation had lessened) but negative for violent behavior. *Id.* Ms. Villareal stated that she was able to take care of herself and her two children. *Id.* Dr. Chai also referred Ms. Villareal for psychotherapy. AR 308.

### 7. Dr. Jocelyn Fuller on December 13, 2008

On December 13, 2008, Dr. Jocelyn Fuller, Ph.D., a State agency psychological consultant, prepared a Psychiatric Review Technique report and a mental Residual Functional Capacity ("RFC") report for Ms. Villareal's disability determination. AR 278. In the Psychiatric Technique Report, Dr. Fuller determined that Ms. Villareal had a depressive disorder that caused her mild restrictions in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. AR 278-90.

In the mental RFC Report, Dr. Fuller indicated that Ms. Villareal's understanding and memory, sustained concentration and persistence, and social interaction and adaptation were overall not significantly limited, though Ms. Villareal's abilities to understand and remember very short and simple instructions and carry out detailed instructions were determined to be moderately limited. AR 292-93. Generally, Dr. Fuller indicated that Ms. Villareal could perform "simple work." AR 294.

### 8. Dr. Chai in January and February 2009

In notes from a January 7, 2009, appointment, Dr. Chai indicated that Ms. Villareal should continue her medication, and that she would increase her doses of Zoloft and Risperidone. AR 304. Dr. Chai also wrote "psychotherapy." *Id.* The doctor noted that Ms. Villareal had a history of amphetamine abuse that was reported in "full remission." *Id.* Ms. Villareal reported feeling "better," and "okay" during the past two months, with fair memory and concentration. *Id.* Dr. Chai noted that Ms. Villareal was negative for worthlessness, racing thoughts, increased talking, increased energy, hopelessness, and violent behavior, but positive for agitation and anxiety. *Id.* Ms. Villareal said she had been compliant with her medication. *Id.* Dr. Chai wrote that she had "[f]air hygiene/grooming, fair eye contract, cooperated with interview," and that her attention and concentration was fair and did not observe agitation or abnormal movement. *Id.*

On February 5, 2009, Ms. Villareal visited Dr. Chai for the last time indicated in the record. *See*

AR 301-12.  Dr. Chai noted that Ms. Villareal reported feeling "ok" during the last four weeks, with an "ok" but sometimes depressed mood.  AR 303.  Dr. Chai recorded that Ms. Villareal denied suffering from racing thoughts, increased talking, increased energy, violent behavior, or feelings of hopelessness or worthlessness.  *Id.*  Ms. Villareal did report feeling anxiety and agitation.  *Id.*  Ms. Villareal also reported being compliant with her medication "most time[s]" but forgot to take it sometimes.  *Id.*  Dr. Chai observed that Ms. Villareal had "[f]air hygiene/grooming, fair eye contract, cooperated with interview," and her attention and concentration was fair.  *Id.*  Dr. Chai did not observe any agitation or abnormal movements.  *Id.*  Dr. Chai wrote that she advised Ms. Villareal to continue and comply with her medication, return to the clinic in four weeks, and to call if her symptoms worsened.  *Id.*  Dr. Chai also indicated that she "finished the form for lawyer" on February 5, 2009.  AR 302.

### 9. Dr. Chai's Mental RFC Report

Dr. Chai completed two mental RFC reports on Ms. Villareal.  *See* AR 332-37.[6]  *See* AR 332-37. She stated that she had seen Ms. Villareal on September 24, 2008, October 16, 2008, November 4, 2008, January 7, 2009, and February 5, 2009.  AR 332.  She listed Ms. Villareal's current Global Assessment of Functioning score ("GAF") at 45.  *Id.*  She also indicated that Ms. Villareal had been on Risperidone and Zoloft since September 24, 2008, with a dosage increase on January 7, 2009.  *Id.* She reported that Ms. Villareal denied any side effects from the medications.  *Id.*  Dr. Chai then wrote that Ms. Villareal's "prognosis would be better" if she were compliant with treatment.  *Id.*

Dr. Chai identified Ms. Villareal's signs and symptoms as "[a]ppetite disturbance with weight change," "[d]ecreased energy," "[m]ood disturbances," and a history of "[p]aranoid thinking or inappropriate suspiciousness."  AR 333.

Dr. Chai also filled in a checkbox form titled "MENTAL ABILITIES AND APTITUDES NEEDED TO DO UNSKILLED WORK."  AR 334.  She evaluated as "[s]eriously limited, but not precluded" Ms. Villareal's abilities to "[r]emember work-like procedures," understand and carry out

---

[6]  Dr. Chai signed and dated one version of the RFC report on February 5, 2009.  AR 332-335, 337.  The record contains another version of the last page of the RFC report.  AR 336.  Dr. Chai signed and dated this page on April 30, 2009.  The ALJ refers to these as two separate opinions.  *See* AR 30.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   "very short and simple instructions," and "[a]sk simple questions or request assistance." *Id.*  Dr.

2   Chai rated Ms. Villareal as "[u]nable to meet competitive standards" in the following areas:

3   1) maintaining attention for a two-hour time period, 2) regularly attending and being punctual within

4   "usually strict tolerance," 3) maintaining an "ordinary routine without special supervision," 4)

5   working "in coordination with or proximity to others without being unduly distracted," 5) making

6   "simple work-related decisions," 6) finishing "a normal workday and workweek without

7   interruptions from psychologically based symptoms," 7) performing "at a consistent pace without an

8   unreasonable number and length of rest periods," 8) being aware of and taking appropriate

9   precautions regarding "normal hazards," 9) understanding and remembering "detailed instructions,"

10  10) carrying out "detailed instructions," and 11) setting "realistic goals"or making plans

11  independently of others.  AR 334-35.

12       Dr. Chai gave Ms. Villareal the lowest rating, "[n]o useful ability to function," in the following

13  areas: 1) accepting instructions and responding appropriately to criticism from a supervisor,

14  2) getting along with "co-workers or peers without unduly distracting them or exhibiting behavioral

15  extremes," 3) responding "appropriately to changes in a routine work setting," 4) dealing with

16  "normal work stress," and 5) dealing with the "stress of semiskilled and skilled work."

17  AR 334-35.

18       Dr. Chai evaluated Ms. Villareal's ability to perform particular kinds of jobs as limited to

19  varying degrees.  *See* AR 335.  She rated Ms. Villareal as having no useful functional ability to

20  "[i]nteract appropriately with the general public" and "[m]aintain socially appropriate behavior." *Id.*

21  Dr. Chai rated Ms. Villareal as unable to meet competitive standards in traveling to new places and

22  "[s]eriously limited, but not precluded from meeting "basic standards of neatness and cleanliness,"

23  and using public transportation.  *Id.*  According to Dr. Chai, Ms. Villareal suffered from a depressed

24  mood, "agitation sometimes," anxiety, tiredness, and low motivation.  AR 335.

25       On the final page of the RFC form, Dr. Chai wrote that Ms. Villareal's impairment would cause

26  her to miss more than four days of work per month, she is not a malingerer, her impairments are

27  reasonably consistent with the described symptoms and functional limitations, and these limitations

28  applied from the September 24, 2008, assessment.  AR 337.  One question on the final page asked,

"[h]as your patient's impairment lasted or can it be expected to last at least twelve months?" *Id.* Dr. Chai wrote "N/A" instead of answering yes or no. *Id.* Under the question, she wrote "only psychotherapy x 2 times" and ↑ dose on 1/7/08." *Id.* Dr. Chai also answered "N/A" to whether Ms. Villareal could manage benefits in her own best interest. *Id.*

The record contains another version of this page that is signed by Dr. Chai and dated April 30, 2009. AR 336. The answers on the April 30 RFC form are the same except that this time Dr. Chai opined that Ms. Villareal's impairment could be expected to last at least 12 months and that she could manage benefits in her own best interest. *Id.*

### 10. Dr. L. Leaf on April 20, 2009

On April 20, 2009, Dr. L. Leaf, a state agency psychological consultant, filled in part of a Psychiatric Technique report on Ms. Villareal. AR 313-26. In the narrative section of the report, AR 326, Dr. Leaf concluded that Ms. Villareal had severe depression, but not at a "listing level of severity." He then summarized the evidence in the record, concluded that Ms. Villareal's allegations are "partially credible and consistent with the evidence in file" and that the "prior decision is affirmed by the current evidence." *Id.*

### 11. Dr. Sadda Reddy, Undated

Dr. Sadda Reddy, M.D., a state agency psychological consultant, completed an undated reconsideration Medical Evaluation and Case Analysis on Ms. Villareal. AR 328. Dr. Reddy found "inconsistencies within/between reports and allegations" and also that Ms. Villareal's allegations did not appear credible. AR 329. Dr. Reddy affirmed the prior assessment of Ms. Villareal's disability as non-severe, and added that she took over-the-counter Tylenol for her headaches, which did not appear to be severe. *Id.* Dr. Reddy also stated that the "only additional medical information received since initial" was from Dr. Posada stating that Ms. Villareal had allergic rhinitis and containing results from a chest x-ray that were normal. *Id.*

### B. Other Opinion Evidence

#### 1. Mr. Jack Brito on September 16, 2008

On September 16, 2008, Mr. Brito, a friend of Ms. Villareal, filled out a Third Party Function report. AR 132. In the report, he stated that he had known Ms. Villareal for 34 years and spent time

with her through "occasional visits and driving her to appointments." *Id.* He wrote that she lived in a house with family, and that during the day, she did general housework, watched television, and read newspapers and books. *Id.* He said that since the onset of her disability, Ms. Villareal had ceased being able to work, socialize, and run errands, and also that she could not sleep through the night due to tossing and turning, leaving her "exhausted." *Id.* He reported that she had "difficulty dressing," she found bathing "difficult" with "many problems," she could not care for her hair, and she was in a "depressed state," with "crying, sadness." *Id.* He indicated that she needed reminders about personal needs and grooming, specifying that they were required for bathing, changing, communicating, and socializing. AR 134.

Mr. Brito wrote that Ms. Villareal was able to make sandwiches and frozen food though she could not grocery shop without assistance and was "much slower" with food preparation than she had been prior to the onset of her disability. *Id.* According to Mr. Brito, Ms. Villareal did housework and kitchen chores slowly, sometimes with help. AR 134-35. She went outside rarely because of depression and fear as well as "lack of transportation." AR 135. She shopped once a month, primarily for groceries, for approximately two hours. *Id.* She went out alone "sometimes" to doctors' appointments, to which she would walk or use public transportation since she had difficulty driving. *Id.* While Mr. Brito reported that Ms. Villareal could pay bills, count change, and use a checkbook or money orders, she could not handle a savings account and had "limited funds." AR 136. He listed her only hobby or interest as watching television, and noted that since the onset of her illness, her attention span had shortened. *Id.* He indicated that Ms. Villareal did not spend time with others and that she mostly remained in her home, though she sometimes went to church. *Id.* At church, she was "mostly quiet and pensive," and Mr. Brito observed that Ms. Villareal "does very little without having someone with her." *Id.* Ms. Villareal had problems getting along with others given that her "depression causes anger and outbursts at small things." AR 137.

Mr. Brito indicated that Ms. Villareal's illness affected lifting, squatting, bending, reaching, walking, kneeling, talking, memory, completing tasks, concentration, following instructions, and getting along with others. *Id.* He added that she was "weak, unstable, overweight, and exhausted" and could walk for a half mile before needing to rest for 10 minutes. *Id.* Ms. Villareal could not pay

1    attention for a significant period of time or finish what she started.  *Id.*  Her ability to follow written

2    and spoken instructions was fair, while her ability to get along with authority figures was poor due to

3    her perception that she was being bullied.  AR 138.  She also handled stress and change in routine

4    "not well," and exhibited unusual behavior or fears in the form of fear of "being alone and going out

5    alone."  *Id.*  Mr. Brito wrote that Ms. Villareal needed a hearing aid and glasses or contact lenses

6    daily and that these items had been prescribed the previous year.  *Id.*

7         Under final remarks, Mr. Brito wrote, "Most areas are covered. The major problem is the

8    depressive state that effects [sic] so many of the difficulties mentioned."  AR 139.

9              ***2. Ordonez Function Report***

10        The Administrative Record contains another Third Party Function report that was submitted

11   electronically.  AR 181.  The form report was filled in by hand, though it is unsigned.  *See* AR 182-

12   90.  Between the pages numbered nine and ten is a photocopy of the business card of Ms. Delia

13   Ordonez, a Clinical Services Specialist at Momentum for Mental Health.  *See* AR 189.  The only

14   other marking on the page is the note: "Dec 10th 4:30."  AR 189.  Page ten has empty blanks for the

15   author to print his or her name and provide contact info and the date.  AR 190.[7]

16        The report states that Ms. Villareal was not able to socialize with her friends and family and was

17   "unable to sleep due to racing thoughts" from 1 a.m. to 4 a.m.  AR 183.  Ms. Villareal could not

18   bathe or care for her hair, needed reminders from her son to shower, and would prepare food only

19   once a day because she did not want to eat after breakfast.  AR 183-84.  According to the form, Ms.

20   Villareal performed household chores once a week and, by her own account, went outside only when

21   necessary.  AR 185.  On such occasions she would use public transportation and could not go alone.

22   *Id.*  Ms. Villareal did not drive because "she doesn't want to drive (her answer)."  *Id.*  She also went

23   grocery shopping twice per month for an hour at a time, and could pay bills and use money orders.

24   *Id.*

25        Ms. Villareal reported "no hobbies, no interest," did not spend time with others, and went

26   regularly only to the store (without the need for reminders or accompaniment).  AR 186.  The form

27

28        [7] As discussed below, the court concludes for purposes of this order that this report was
     submitted by Ms. Delia Ordonez.

1   explained that Ms. Villareal had difficulty socializing because was angry and felt "people [were]

2   staring / talking about her" and that she had felt angry for the past ten years.  AR 187.

3       In the section titled "information about abilities," the form indicates that Ms. Villareal's

4   problems affected her ability to talk, complete tasks, concentrate, follow instructions, and get along

5   with others.  *Id.*  Her "poor concentration prevent[ed] following instructions," and her continued

6   belief that people were talking about her affected her ability to get along with others.  *Id.*  Ms.

7   Villareal could walk one mile before needing to rest for ten minutes, and could pay attention only for

8   approximately one to ten minutes, at which point she would become angry.  *Id.*  Ms. Villareal did

9   not finish tasks or follow written or spoken instructions well, while spoken instruction made her

10  angry.  *Id.*  She could not get along with authority figures due to her anger, or handle stress or

11  change in routine.  AR 188.  She was fired or laid off from her daycare job because of yelling at

12  children and presented with an unusual behavior or fear: the fear of people.  *Id.*

**C. Vocational Expert Testimony**

   ***1. Mr. Thomas Linvill***

15      Mr. Thomas Linvill is the Vocational Expert (the "VE") who testified during the May 20, 2010

16  hearing and answered the ALJ's hypotheticals regarding whether people with certain limitations

17  could find alternative work in the national economy.  AR 42-43, 55-58.  Mr. Linvill testified that

18  Ms. Villareal's past relevant work was analogous to a nursery school attendant.  AR 56.  He testified

19  that a hypothetical person with "no exertional limitations, limited simple repetitive tasks" would be

20  able to find alternative employment in unskilled jobs, such as hand packager, laboratory sample

21  carrier, and housekeeper/cleaner.  *Id.*  He then testified that a person with the same hypothetical

22  limitations, who also could not handle working with the general public, could work as a hand

23  packager, laboratory sample carrier, or semi-conductor production worker.  AR 57.  Finally, the VE

24  testified that there would be no suitable work for a hypothetical person that the ALJ described as "an

25  individual who was unable to meet to competitive standards in maintaining attention for two-hour

26  segments, maintaining regular attendance, sustaining an ordinary routine, making simple work

27  related decisions, completing a normal work day, etc, etc. and would also miss four days of work per

28  month."  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

**D.  Ms. Villareal's Testimony**

At the May 20, 2010, hearing, Ms. Villareal described her health problems, life history, past and present employment, and trouble with anger management.  AR 44-55.

Ms. Villareal testified she lived with her two sons and worked as a caretaker for her mother for twelve hours per week, earning $11.99 per hour.  AR 45-46.  She stated that she did not drive but rather took the bus to her mother's home.  AR 46.

When asked what mental health treatment she was receiving, Ms. Villareal said she was on medication and had been seeing a therapist once a week for just over a year.  AR 46.  Ms. Villareal's attorney told the judge that exhibit 11E was the therapist's third-party questionnaire.[8]  *Id.*  Ms. Villareal also said she had never been on SSI.  *Id.*

Ms. Villareal was uncertain of when she last worked full-time, stating, "I don't even remember. I forget a lot of things."  AR 47.  Ms. Villareal confirmed that she worked in childcare for approximately two years as an independent contractor, usually full time.  *Id.*  She was "let go" around June 2008 because she yelled at one of the children.  *Id.*

Ms. Villareal said she was not on medication when she was let go, but she sought treatment for the first time a month later in about August 2008 because her sons and "everybody" suggested that she needed help.  AR 48.  She reported, "I would get real depressed.  I wouldn't take a shower.  I would just stay in my room."  *Id.*  Ms. Villareal was not sure if the medication she received from Dr. Chai had improved her condition, but stated that she had to tell the doctor that it did because Dr. Chai wanted to institutionalize her because of her anger management problems, which she described as debilitating.  *Id.*  Ms. Villareal described her problems with anger as debilitating.  AR 48.  She claimed that she would not drive because of "road rage or something."  *Id.*  Ms. Villareal related that she yelled and "cussed . . . out" "everybody," including strangers.  AR 49.  She also said that she felt that in moments of rage she was out of control and might physically hurt someone.  *Id.*

Ms. Villareal testified that her father used to beat her when she was young.  *Id.*  She left home after her father threw her out, around age seventeen.  She never married, but lived with the father of

---

[8]  Exhibit 11E is the report containing the business card of Ms. Delia Ordonez on a separate page.  *See* AR 181-190.

her children, a member of the Mongrels biker gang, who was abusive. *Id.* She also explained that she used to be addicted to drugs, though she had been clean for ten years. AR 50.

Ms. Villareal also testified about her anger management difficulties. She discussed an incident in which she yelled at a bus driver and explained that she had been referred to anger management, but did not attend. AR 51-52. Ms. Villareal speculated that the medication she was taking might be exacerbating her anger issues. AR 52-53. She testified that at one point, she had stopped taking the medication Dr. Chai prescribed for her and that this prevented Dr. Chai from increasing her dosage. *Id.* She then reiterated her problems with controlling her anger and her concerns about potentially hurting someone and explained that her anger stemmed from physical abuse she had suffered in the past. AR 54.

The ALJ asked Ms. Villareal how she was able to work for her mother in light of these issues. AR 54. Ms. Villareal replied, "She's my mom. You know, I mean if I break something, she's going to let it slide. You know, I mean, if I ever get angry, I leave. And then of course I have to come back and make up for the hours, you know." *Id.*

**E. Summary of ALJ's Decision**

Applying the five-step evaluation process, on August 5, 2010, the ALJ held that Ms. Villareal was not disabled under § 1614(a)(3)(A) of the Social Security Act and therefore was not entitled to supplemental security income. AR 26-33.

At step one, the ALJ found that Ms. Villareal had not engaged in substantial gainful activity since applying for benefits on August 11, 2008. AR 28.

At step two, the ALJ found that Ms. Villareal suffered from major depressive disorder. AR 28. While Ms. Villareal also alleged migraine headaches and kidney problems, the ALJ determined that there was little documentation of the migraine headaches in the medical evidence and that Ms. Villareal's appeared to have recovered from her alleged kidney problems. AR 28. The ALJ therefore determined that these impairments were non-severe with no more than a minimal limitation to Ms. Villareal's ability to work. AR 28.

At step three, the ALJ found that Ms. Villareal did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the

1   listed impairments.  AR 28.

2       The ALJ then determined Ms. Villareal's RFC in order to assess at steps four and five whether

3   she could perform her past relevant work or any other work considering her age, education, and

4   work experience.  AR 29.  The ALJ found that Ms. Villareal had the RFC to perform a full range of

5   work at all exertional levels but with nonexertional limitations.  AR 29.  Specifically, the ALJ

6   concluded that Ms. Villareal was limited to performing work that involves simple, repetitive tasks.

7   AR 29.  In making this finding, the ALJ considered Ms. Villareal's symptoms and how consistent

8   they were with the objective medical evidence, as required by 20 C.F.R. § 416.929 and Social

9   Security Rulings 96-4p and 96-7p.  AR 29.

10      The ALJ also considered the opinion evidence, according to the required two-prong analysis.

11   AR 29; *see* 20 C.F.R. § 416.927; Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.  First, the

12   ALJ determined whether Ms. Villeareal had a medically determinable physical or mental impairment

13   that reasonably could be expected to produce her pain and symptoms.  AR 29.  As discussed, the

14   ALJ found that Ms. Villareal had major depressive disorder, but that the evidence was not sufficient

15   to support the physical impairments from which she claimed to suffer.  *See* AR 28.

16      Second, the ALJ determined the extent to which Ms. Villareal's ability to do basic work

17   activities was affected by the intensity, persistence, and limiting effects of her depressive symptoms.

18   AR 29.  Under this prong, whenever Ms. Villareal's statements about the intensity or functionally

19   limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the

20   ALJ made findings on the credibility of the statements based on "the entire case record."  AR 29-30.

21   The ALJ determined that "the . . . residual functional capacity assessment is supported by the sparse

22   medical evidence; the well-supported medical opinions of Dr. Acenas and the State agency

23   psychological consultants; claimant's wide range of acknowledged daily activities; and claimant's

24   virtually non-existent work history."  AR 31.  The ALJ concluded that Ms. Villareal's alleged

25   limitations on daily activities could not be verified, and even if Ms. Villareal were truly so limited, it

26   was difficult to attribute such limitation to her medical condition alone.  AR 31.

27       ***1.  The ALJ's Consideration of the Objective Medical Evidence***

28      The ALJ gave great weight to examining physician Dr. Acenas's psychiatric consultative

UNITED STATES DISTRICT COURT
For the Northern District of California

examination, finding it "consistent with and well-supported by the record as a whole." AR 30. The ALJ cited Dr. Acenas's finding that Ms. Villareal was "essentially normal with the exception of depressed mood and slight impairment in memory," that "the likelihood of recovery with continuous treatment was good," and that Ms. Villareal could work in jobs requiring only simple, repetitive tasks. *Id.* For the "same reasons," the ALJ also heavily weighted the state agency psychological consultants' mental RFC assessments. *Id.*

By contrast, the ALJ gave little weight to treating psychiatrist Dr. Chai's opinions. *Id.* The ALJ found Dr. Chai's opinions that Ms. Villareal's mental RFC was "extremely limited" to be inconsistent with and not well supported by the record as a whole as well as inconsistent with each other. *Id.* The ALJ specifically found that because Dr. Chai's opinion changed between February and April 2008 regarding whether Ms. Villareal's impairment had lasted or could be expected to last at least 12 months, it was inconsistent and not worthy of significant weight. *Id.* The ALJ also determined it was significant that Dr. Chai commented that if Ms. Villareal were "more compliant" with medication, her prognosis would improve. AR 30.

### 2. The ALJ's Consideration of Other Opinion Evidence

The ALJ accorded little weight to the Third Party Function report of Ms. Villareal's friend Mr. Brito because she determined it was founded mainly on Ms. Villareal's "subjective report." AR 30. Mr. Brito knew Ms. Villareal through "occasional visits" and driving her to appointments yet stated that Ms. Villareal "tosses and turns throughout the night." AR 30. Furthermore, Mr. Brito "concede[d]" that Ms. Villareal in fact did housework, went grocery shopping, watched television, read books and newspapers, and sometimes attended church. AR 30-31.

Because the ALJ determined that the Ordonez Third Party Function report was undated and unsigned, the ALJ stated that she could not confirm Ms. Villareal's testimony that the document was in fact filled out by a therapist Ms. Ordonez.[9] AR 31. The ALJ noted that the report nonetheless corroborated that Ms. Villareal could participate in a wide range of ordinary activities. AR 31.

---

[9] The page containing the business card of Ms. Ordonez is in fact dated December 8 but does not include a year. AR 189.

### *3. The ALJ's Determination of Ms. Villareal's Credibility*

The ALJ determined that Ms. Villareal's medically determinable impairments could reasonably be anticipated to cause her claimed symptoms.[10]  AR 30-31.  She also concluded, however, that Ms. Villareal's statements regarding "the intensity, persistence and limiting effects of these impairments are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  AR 30.

The ALJ specifically noted that despite the alleged severity of Ms. Villareal's mental disorder, Ms. Villareal did not seek psychiatric treatment until two weeks prior to the psychiatric consultive examination and that she had relatively few visits with Dr. Chai and her psychotherapist.  *Id.*  The ALJ characterized these visits as "unremarkable," with Ms. Villareal reporting she was "stable" in December 2008 and "better" several months later.  *Id.*

Finally, the ALJ did not credit Ms. Villareal's report of "major problems" with anger, because Ms. Villareal had never been to anger management classes, had worked two years in childcare without an outburst, and was able to control her emotions during the hearing.  AR 31.

### *4. Remaining Steps and the ALJ's Conclusion*

At step four, the ALJ found that Ms. Villareal was unable to perform her past relevant work as a nursery attendant because the VE testified that Ms. Villareal was limited to simple, repetitive tasks.  *Id.*

At step five, the ALJ noted that Ms. Villareal was an "individual of advanced age" pursuant to 20 C.F.R. § 416.963, had at least a high school education, and was able to communicate in English.  *Id.*  According to the ALJ, whether Ms. Villareal's job skills were transferable was immaterial because the Medical-Vocational Rules supported a finding that Ms. Villareal was not disabled.  *Id.*  The ALJ found that there were jobs existing in significant numbers in the national economy that Ms. Villareal could perform in light of her age, education, work experience, and RFC.  AR 31.  Finally, the ALJ relied on the VE's testimony to find that Ms. Villareal was "capable of making a successful

---

[10]  The ALJ summarized Ms. Villareal's claimed symptoms as being unable to work because she is "depressed, feels strange, becomes angry easily, cries a lot, yells at others, does not want to deal with other people, fears other people are talking about her, isolates herself, and has a short attention span."  AR 30.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  adjustment to other work that exists in significant numbers in the national economy" and that a

2  finding of "not disabled" was merited under § 204.00 in the Medical-Vocational Guidelines.  AR 32.

## ANALYSIS

4  Ms. Villareal challenges the ALJ's decision on the following four grounds: (1) the ALJ did not

5  properly weigh the opinion of her treating physician; (2) the ALJ improperly disregarded Ms.

6  Ordonez's Third Party Function report; (3) the ALJ improperly rejected the testimony of Ms.

7  Villareal as not credible; and (4) the ALJ made her ruling based on a hypothetical that did not

8  encompass the treating psychiatrist's opinion.  Pl's Mot., ECF N. 20 at 5-6.

## I. LEGAL STANDARD

### A. Standard of Review

11  Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

12  Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

13  aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

14  are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v.*

15  *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

16  than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

17  might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

18  1995).  If the evidence in the administrative record supports both the ALJ's decision and a different

19  outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See*

20  *id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

### B. Applicable Law: Five Steps to Determine Disability

22  An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

23  or mental impairment which can be expected to result in death or which has lasted or can be

24  expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

25  impairments are of such severity that he is not only unable to do his previous work but cannot,

26  considering his age, education, and work experience, engage in any other kind of substantial gainful

27  work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

28  The Social Security regulations set out a five-step sequential process for determining whether a

UNITED STATES DISTRICT COURT
For the Northern District of California

claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work"? If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *See Tackett*, 180 F.3d at 1098.

## II. APPLICATION

### A. Treating Physician's Opinion

Ms. Villareal first contends that the ALJ erred by "accord[ing] little weight to Dr. Chai's opinion, [and] giving greater weight to the opinion of consultant Dr. Antoinette Acenas, who saw Ms. Villareal only once, and the non-examining state consultants." Pl.'s Motion, ECF No. 20 at 10. The court agrees.

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1   *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the Social

2   Security Administration favors the opinion of a treating physician over non-treating physicians."

3   *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "The opinion of a

4   treating physician is given deference because 'he is employed to cure and has a greater opportunity

5   to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169

6   F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

7   "However, the opinion of the treating physician is not necessarily conclusive as to either the

8   physical condition or the ultimate issue of disability." *Id.* (citing *Magallanes*, 881 F.2d at 751 and

9   *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

10      "If a treating physician's opinion is 'well-supported by medically acceptable clinical and

11   laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

12   case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631 (quoting 20 C.F.R.

13   § 404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight' because it is

14   not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the

15   [Social Security] Administration considers specified factors in determining the weight it will be

16   given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of

17   examination' by the treating physician; and the 'nature and extent of the treatment relationship'

18   between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

19      Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the
       treating physician, include the amount of relevant evidence that supports the opinion and the

20      quality of the explanation provided; the consistency of the medical opinion with the record as a
       whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the

21      degree of understanding a physician has of the [Social Security] Administration's "disability
       programs and their evidentiary requirements" and the degree of his or her familiarity with other

22      information in the case record.

23   *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

24      Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still

25   is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n

26   many cases, a treating source's medical opinion will be entitled to the greatest weight and should be

27   adopted, even if it does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

28      "Generally, the opinions of examining physicians are afforded more weight than those of

non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); see also 20 C.F.R. § 404.1527(d).  Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quotation omitted).[11]  Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602.  An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.*  Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their

_____

[11]  Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different. As the Ninth Circuit explained in *Lester v. Chater*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion.  While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors—neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons—we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians. *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d).  Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion.  Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester v. Chater*, 81 F.3d 821, 831 n.8 (1995).

UNITED STATES DISTRICT COURT
For the Northern District of California

1   opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

2       Here, the ALJ discounted the opinion of Dr. Chai, the treating physician.  The ALJ stated:

3       I accord little weight to the February and April 2009 opinions of claimant's treating
        psychiatrist, Dr. Chai.  Her opinion of an extremely limited mental residual functional
4       capacity is not only inconsistent with and not well-supported by the record as a whole, but is
        inconsistent.  In February 2009, she responded "N/A" to whether claimant's impairment
5       lasted or can be expected to last at least 12 months.  However, in April 2009–only two
        months later–she suddenly changed her opinion to "yes."  Notably, Dr. Chai also commented
6       that if claimant were compliant with her medication, she would have a better prognosis.

7   AR 30.

8       The court finds that the ALJ did not provide specific or legitimate reasons supported by

9   substantial evidence for discounting Dr. Chai's opinions.  There is nothing contradictory or

10  inconsistent in Dr. Chai's amending her prognosis for Ms. Villareal between February and April

11  2008.  As Ms. Villareal argues, this may reflect honest uncertainty on Dr. Chai's part that resolved

12  over time.  Pl's Reply, ECF No. 20 at 2.  Nor did the ALJ offer specific reasons for why Ms.

13  Villareal's lack of compliance with medication warranted according little weight to Dr. Chai's

14  opinion.  In sum, the ALJ offered no specific support for her conclusion that Dr. Chai's opinion is

15  "inconsistent with and not well-supported by the record as a whole."  *See* AR 30.

16      The court rejects the Commissioner's contention that the ALJ was justified in discounting Dr.

17  Chai's opinion because of "conservative" treatment and Ms. Villareal's own report of her symptoms

18  because the ALJ did not make those arguments. *See* Comm'r's Opp'n and Cross-Mot., ECF No. 21

19  at 6-9.  The court cannot provide post-hoc rationalizations for the ALJ's decision.  *See SEC v.*

20  *Chenery Corp.*, 332 U.S. 194, 196 (1947).  Accordingly, based on the record presented, the court

21  finds that the ALJ erred by elevating the opinions of Dr. Acenas and the State consultants over those

22  of Dr. Chai.

23      The Commissioner also counters that in *Tonapetyan v. Halter*, 242 F.3d 1144 (9th Cir. 2001), the

24  Ninth Circuit held that an "examining physician's opinion alone may constitute substantial evidence,

25  because it rests on his own independent examination of the claimant."  Comm'r's Opp'n and Cross-

26  Mot., ECF No. 21 at 2.  *Tonapetyan* is distinguishable because there, the ALJ rejected a treating

27  physician's opinion for the specific and legitimate reasons that "it was unsupported by rationale or

28  treatment notes, and offered no objective medical findings to support the existence of [the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   claimant's] alleged conditions."  242 F.3d at 1149.  In this case, by contrast, Dr. Chai treated Ms.

2   Villareal over the course of at least six months, and her treatment notes (including her medical

3   findings) are included are in the record.  Furthermore, while the opinion of examining psychiatrist

4   Dr. Acenas may constitute substantial evidence, it is insufficient on its own to justify discounting Dr.

5   Chai's opinions.  *See Morgan*, 169 F.3d at 602.

6       The ALJ's cursory dismissal of Dr. Chai's opinion failed to give it the deference required under

7   the Code of Federal Regulations.  *See* SSR 96-2P (explaining that a treating source opinion, even if

8   inconsistent with other substantial evidence in the record, must be afforded deference and weighed

9   using all the factors listed under 20 C.F.R. § 404.1527).  The court, therefore, remands to the agency

10   with instructions to reconsider Ms. Villareal's disability determination after giving appropriate

11   deference to Dr. Chai's opinion.

12   **B.  Ordonez Third Party Function Report**

13       Ms. Villareal's second major argument is that the ALJ erred by rejecting the unsigned Ordonez

14   report, which she claims supports a finding that she is disabled.[12]  Pl.'s Mot., ECF No. 20 at 10.  Ms.

15   Villareal contends that the ALJ should have attempted to contact Ms. Ordonez using the information

16   on the attached business card.  *Id.*  The Commissioner counters that it was reasonable to give little

17   weight to the report because it was unsigned and because Ms. Villareal bears the burden to prove her

18   case.  Comm'r's Opp'n and Cross-Mot., ECF No. 21 at 8.

19       Under the regulations applicable at the time of Ms. Villareal's hearing, an ALJ had the burden to

20   recontact a medical source when a report from that source contained a "conflict or ambiguity" in

21   need of resolution:

22       Recontacting medical sources. When the evidence we receive from your treating physician or
        psychologist or other medical source is inadequate for us to determine whether you are
23       disabled, we will need additional information to reach a determination or a decision. To
        obtain the information, we will take the following actions.
24
        (1) We will first recontact your treating physician or psychologist or other medical source to
25       determine whether the additional information we need is readily available. We will seek
        additional evidence or clarification from your medical source when the report from your
26       medical source contains a conflict or ambiguity that must be resolved, the report does not
        contain all the necessary information, or does not appear to be based on medically acceptable
27       clinical and laboratory diagnostic techniques. We may do this by requesting copies of your

28

___

[12]  At the hearing, Ms. Villareal testified that Ms. Ordonez was her therapist.  AR 46.

medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. §§ 404.1512(e) and 416.912(e) (2006).  Accordingly, the court finds that at the time of the hearing, the ALJ was required to clarify whether Ms. Ordonez was the author of the report and could not reject it merely because it was unsigned.  *See Peckham v. Astrue*, 780 F. Supp. 2d 1195, 1204 (D. Kan. 2011).

The court's conclusion is bolstered by the fact that the Ordonez report is written on a standard form provided by the SSA.  The form has spaces for a printed name with contact information but does not indicate it must be signed to be valid and provides no place for a signature.  *See* AR 190.  While the page asking for this information was left blank, the Commissioner fails to explain why the attached business card was insufficient.

Nor is the court persuaded by the Commissioner's counter-arguments.  First, the Commissoner argues that a claimant generally has the burden of proof at steps one through four.  While that is generally true, the regulations quoted above carve out a limited exception to that rule.  *See* 20 C.F.R. §§ 404.1512(e) and 416.912(e).  Second, the Commissioner argues that ALJ could have accorded the Ordonez report little weight because it was just a "check-box" form that lacked information about the length and depth of Ms. Ordonez's interaction with Ms. Villareal.  Comm'r's Opp'n and Cross-Mot., ECF No. 21 at 8.  This argument is unpersuasive because the ALJ did not make that point and the court cannot consider post-hoc justifications for the ALJ's decision.  *See SEC*, 332 U.S. at 196.

Finally, the ALJ characterized the Ordonez report as establishing that Ms. Villareal was "capable of a wide range of daily activities," but provided no support for that conclusion.  AR 31.  Given the paucity of records available from treating medical sources and the ALJ's failure to discuss the content of the report in any depth, the ALJ did not make a fair and adequate determination of Ms. Villareal's disability based on this record.  The court remands to the agency with instructions to comply with the 2006 regulations then in effect.[13]  The agency should accord the report the weight

_____

[13]  That could entail contacting Ms. Ordonez to confirm that she is the report's author.  Given that three years have passed, if the agency is unable to locate Ms. Ordonez or otherwise verify or refute the accuracy of the report, it should, in light of high likelihood that Ms. Ordonez was the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   due to the evaluation of a treating therapist unless it confirms that Ms. Ordonez was not the treating

2   therapist who wrote the report.

3   **C. Ms. Villareal's Credibility**

4   Ms. Villareal also contends that the ALJ erred by discrediting her testimony about her subjective

5   symptoms.  Pl.'s Mot., ECF No. 20 at 10-11.  The Commissioner counters that the ALJ properly

6   weighed the objective medical evidence, Ms. Villareal's statements, her acknowledged range of

7   daily activities, her poor work history, and her conservative course of treatment in determining that

8   Ms. Villareal's statements about the severity of her symptoms were not credible.  Comm'r's Opp'n

9   and Cross-Mot., ECF No. 21 at 5-7.

10   To determine whether a claimant's testimony about subjective pain or symptoms is credible, the

11   ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v. Astrue*,

12   504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the claimant has

13   presented objective medical evidence of an underlying impairment that reasonably could be

14   expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504 F.3d at 1036.

15   Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can

16   reject the claimant's testimony about the severity of his symptoms only by offering specific, clear,

17   and convincing reasons for doing so.  *Id.*  When the ALJ finds a claimant's testimony unreliable, the

18   ALJ must "specifically identify what testimony is credible and what testimony undermines the

19   claimant's complaints."  *Morgan*, 169 F.3d at 499.  The court defers to the ALJ's credibility

20   determination if it is supported by substantial evidence in the record.  *See Thomas*, 278 F.3d at 959.

21   Here, the ALJ found that Ms. Villareal's impairments reasonably could have caused her alleged

22   symptoms, but concluded that her statements about the "intensity, persistence, and limiting effects of

23   these symptoms" were not credible to the extent they were inconsistent with the ALJ's RFC

24   determination.  AR 30.  The ALJ did not state that Ms. Villareal was malingering.  *See* AR 30.

25   Thus, the ALJ could have rejected Ms. Villareal's testimony regarding her symptoms only based on

26   specific, clear, and convincing reasons.

27   On this record, the court finds the ALJ's reasoning sufficient.  First, the ALJ noted that Ms.

28

document's author, accord the report the weight due to the opinion of a treating source.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

Villareal did not seek treatment with diligence despite the alleged severity of her disorder.  AR 30.

The ALJ cited the following evidence in support of this observation: (a) Ms. Villareal first sought

psychiatric treatment only two weeks prior to her psychiatric consultative exam with Dr. Acenas;

(b) the record indicated that Ms. Villareal had only five visits with Dr. Chai and only two with a

psychotherapist (despite Ms. Villareal's claim that she saw the psychotherapist once a week); and

(c) Ms. Villareal never attended anger management class and controlled her temper during her

hearing despite her alleged major anger problems.  AR 30-31.

Second, the ALJ observed that Ms. Villareal acknowledged a "wide range of . . . daily activities"

including "personal grooming, household chores of cooking, cleaning, and laundry, and socializing

with friends and relatives."  *Id.*  Third, Ms. Villareal told Dr. Chai she was "stable" in December

2008 and "better" in early 2009.  Finally, the ALJ stated that Ms. Villareal's "virtually non-existent"

work history made her claim less credible.  AR 31.

The specific reasons that the ALJ articulated for discounting Ms. Villareal's credibility are clear

and convincing.  The court therefore defers to the ALJ's determination.  Furthermore, contrary to

Ms. Villareal's contention, the ALJ did cite to and consider Ms. Villareal's Function Report, which

comprises Exhibit 5E in the record.  *See* Pl's Reply, ECF No. 22 at 5; *see also* AR 30 ("Claimant

alleges she is unable to work because she is depressed, feels strange, becomes angry easily, cries a

lot, yells at others, does not want to deal with other people, fears other people are talking about her,

isolates herself, and has a short attention span (Exhibits 3E, 5E, 9E; Hearing Testimony)").

### 1. *Ms. Villareal's Job History*

Ms. Villareal also argues that the ALJ erred by contending that Ms. Villareal worked in childcare

for two years "without incident."  Pl.'s Mot., ECF No. 20 at 10-11.  The Commissioner responds that

to the extent that the court may find that the ALJ erred in determining that Ms. Villareal worked in

childcare for two years "without incident," such error was harmless.  Comm'r's Opp'n and Cross-

Mot., ECF No 21 at 7.

The harmless error rule applies in the social security context.  *McLeod v. Astrue*, 640 F.3d 881,

887 (9th Cir. 2011) (noting that the Supreme Court established that administrative adjudicators are

subject to the same harmless error rule as ordinarily applied in civil cases and citing *Shinseki v.*

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   *Sanders*, 556 U.S. 406 (2009)).  Under this rule, an error is harmless when it is clear that the

2   excluded evidence was "inconsequential to the ultimate nondisability determination" in the context

3   of the record as a whole.  *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (citations omitted).

4   The plaintiff, as the party, attacking the agency's decision, normally bears the burden of proving that

5   an error is harmful.  *Id.* at 1111 (quotation omitted).

6       The court agrees with the Commissioner that to the extent the ALJ characterized Ms. Villareal as

7   "able to work for two years in childcare with no incident," that characterization was not

8   consequential and just was harmless.  Ms. Villareal testified that she was able to work for two years

9   until an incident in which she yelled at a child resulted in her termination.  AR 47.  The ALJ's

10  phrasing did not preclude an incident's occurring after two years.  Ms. Villareal characterizes the

11  ALJ's words as a "serious misstatement of the evidence," but does not meet her burden of proof that

12  the error was harmful to her case or offer any further argument about why the ALJ's statement was

13  harmful.  *See* Pl's Mot., ECF. 20 at 6.  The other point is that the characterization does not seem

14  material to the ultimate nondisability determination because the ALJ's finding hinged on the

15  rejection of Dr. Chai's opinion and Ms. Villareal's subjective complaints.  That being said, given the

16  remand, the full context can be considered by the ALJ.

17      **D.  Hypotheticals to the VE**

18      Finally, Ms. Villareal alleges that the ALJ erred by relying on a hypothetical posed to the VE

19  that contained only the restriction of simple, repetitive tasks instead of making a determination based

20  on another posed hypothetical that encompassed Dr. Chai's opinion.  Pl's Mot., ECF No. 20 at 7.  In

21  light of the court's holding to remand and allow the ALJ to conduct a proper inquiry into the weight

22  that should be given to Dr. Chai's opinion, the ALJ should also reconsider the applicable

23  hypothetical upon remand.

24  **III.  REMAND FOR RECONSIDERATION**

25      It is within the court's discretion to remand a case either for further administrative proceedings

26  or for an award of benefits.  *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  Here, the

27  record is not fully developed, and the court thus remands to the ALJ.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**CONCLUSION**

For the foregoing reasons, the court **GRANTS IN PART** Ms. Villareal's motion and **DENIES** the Commissioner's motion. The matter is remanded for further proceedings consistent with this order.

This disposes of ECF Nos. 20 and 21.

**IT IS SO ORDERED.**

Dated: September 25, 2013



LAUREL BEELER
United States Magistrate Judge

C 12-02334 LB
ORDER

28